IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**ANTONIO JOSE CRUZ-GUZMAN**,
 Petitioner,

 v.

**COMMISSIONER OF SOCIAL SECURITY**,
 Defendant.

Civil No. 19-1974 (BJM)

## OPINION AND ORDER

Antonio Jose Cruz-Guzman ("Cruz") seeks review of the Social Security Administration Commissioner's ("Commissioner's") finding that he is not entitled to disability benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Cruz challenges the administrative law judge's ("ALJ's") Residual Functional Capacity ("RFC") determination on several grounds. Docket No. ("Dkt.") 24. The Commissioner opposes. Dkt. 29. This case is before me by consent of the parties. Dkts. 4, 6. For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## APPLICABLE LEGAL STANDARDS

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; see *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At Step One, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At Step Two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At Step Three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in Appendix 1 of the regulations, impairments that the Commissioner acknowledges are so severe as

to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to Step Four, at which point the ALJ assesses the claimant's RFC and determines whether the claimant's impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final Step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At Steps One through Four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under Step Five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Sec'y of Health & Hum. Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following facts are drawn from the transcript ("Tr.") of the record of proceedings at Dkt. 15.

Cruz's date last insured ("DLI") was December 31, 2016. Tr. 63-64. He is 5'9". Tr. 94. Cruz was 48 years old on his DLI and is now 52. Tr. 38. He is unable to communicate in English. *Id*. On March 2, 1998 (well before the onset date claimed by Cruz), radiologist Dr. Gladimiro Davila found that Cruz was suffering from cervical spasms, mild osteoarthritis, and lumbar spasms, but that he had no disc narrowing; he had normal vertebral bodies; his pedicles and disc spaces were intact; and he had no destructive osseus lesions that could be identified. Tr. 126, 433.

Besides briefly trying his hand at a "line painting" job in 2014 and 2015, the last time that Cruz worked in any capacity was in 2012. Tr. 48-49. In 2012, Cruz was working at a company called Hill Construction as a crane operator. Tr. 51. While working at Hill Construction, Cruz fell; subsequently, his back issues allegedly began to worsen. Tr. 52. Cruz claims an onset date of August 3, 2012. Tr. 32.

Cruz began seeing psychologist Dr. Luis Ramos Vargas ("Dr. Ramos") approximately once per month beginning on September 14, 2015. Tr. 92. Dr. Ramos prepared a report for the Commissioner dated January 29, 2018 (though the actual date of the report would appear to be January 29, 2019) in which he claimed that Cruz had persistent feelings of sadness, crying, hopelessness, helplessness, insecurity, confusion, mental block episodes, anxiety, irritability, isolation, lack of energy, poor tolerance of stress, concentration and memory problems, negative thinking, frequent mood swings, and difficulty falling and staying asleep. Tr. 92, 99. Cruz would apparently wake up frequently due to pain and physical discomfort and would allegedly experience occasional auditory hallucinations. *Id*. Dr. Ramos noted that Cruz had experienced total loss of interest and motivation to perform what used to be pleasant activities. *Id*. He also noted that Cruz had low self-esteem and numerous complaints of physical pain that did not improve with medical treatment. *Id*. Dr. Ramos claimed that Cruz could not walk for more than a minute or two at a time

due to the discomfort and pain he experienced and could not be in one sitting position for more than five minutes either. Tr. 92-93. He noted that Cruz had great difficulty walking and moving because his legs and hands would go numb. Tr. 93. He also claimed that Cruz's pain did not improve even after taking pain medications. *Id*. Cruz's medications included Amitriptyline, Temazepam, Duloxetine, Relafen, and Losartan. Tr. 98. Dr. Ramos noted that Cruz was diagnosed with bulging discs in November 2017 and a herniated disc in September 2019 (though this latter date postdates Dr. Ramos's report and is likely cited in error). Tr. 80-81.

Dr. Ramos stated that on September 14, 2015, he diagnosed Cruz with severe major depressive disorder with accompanying anxiety and panic attacks. Tr. 93. Dr. Ramos noted that he recommended psychiatric hospitalizations on several occasions (December 17, 2016; April 22, 2017; and May 12, 2018) due to Cruz's condition; he also noted that Cruz's mental condition tended to seem chronic. *Id*. He stated that at the time of the report, Cruz was not able to recall words, fully recite the months of the year, fully remember what he had done over the course of the week, got distracted easily, and had trouble concentrating. Tr. 96. Cruz also apparently had trouble with simple math and spelling. Tr. 97. However, Cruz was able to recall important dates and events. Tr. 96. Dr. Ramos said that Cruz had been diagnosed with compression fractures, thoracic and lumbar spondylosis degenerative disc disease, discogenic disc disease, spinal canal stenosis, a bulging disc, cervical disc fusion, a sacralized vertebra, a large left central herniated disc, and a bulging annulus. Tr. 93-94.

Dr. Ramos opined that Cruz was incapable of completing a day of work due to the severity of his mental condition and physical limitations; he claimed that Cruz did not have the required skills to meet the demands that any paying job requires because his cognitive functioning was affected due to his emotional condition and the possibility of side effects from the medications that

he took. Overall, Dr. Ramos found that he did not expect Cruz's condition to improve significantly in the short or long term and found that his prognosis was very poor. Tr. 98-99. Except where noted above, however, Dr. Ramos made little to no reference to precisely when each of Cruz's conditions developed or if, when, and how any of his conditions increased in severity.

In an assessment dated December 17, 2016, just days before Cruz's DLI, Dr. Ramos reported that Cruz was groomed, cooperative, alert, logical, and able to maintain eye contact; however, he also reported that Cruz was depressed and anxious, that his insight and judgment were very poor, and that his anxiety was exacerbated by pain that he had been suffering. Tr. 129. Other assessments from Dr. Ramos support similar findings and include reports of varying degrees of back pain. *See, e.g.*, Tr. 130-157.

On October 20, 2015, Cruz filled out a function report for social security purposes. Tr. 119. Cruz claimed to have some difficulty bending over to grab heavy objects; sitting, standing, or lying down for long periods; and sleeping, bathing, and dressing. Tr. 119-20. He allegedly lacked motivation to maintain personal hygiene and had some trouble remembering to take his medication unless he left himself notes. Tr. 114. Although he performed some chores, he claimed to also face some difficulty in doing so due to his back condition. Tr. 114-15. He reported driving alone, shopping for food and personal items, taking care of financial matters, cooking, caring for his wife and a pet, watching TV, listening to music, going on walks, attending church and family events, and dealing well with authority figures. Tr. 113-118. However, he also claimed to have little tolerance for or interest in social activities as well as nerves. Tr. 117.

Cruz reported difficulty with standing, bending, reaching, walking, sitting, kneeling, climbing stairs, remembering, finishing things, concentrating, comprehending, and following instructions; however, he reported no difficulty using his hands despite being prompted to report

such difficulty if it existed. *Id*. Cruz did state that he could only lift 10-20 pounds and walk short distances (around 20-30 minutes before having to stop and rest for around 15-20 minutes) and noted difficulty following both written and oral instructions. *Id*. He reported using glasses but did not report using a cane or any other assistive device for standing or walking despite being prompted to make such a report if applicable. Tr. 118. He reported no secondary effects from his medications when asked to provide information regarding any such effects. Tr. 119.

On November 16, 2015, Cruz underwent a neurological evaluation with Dr. Priscilla Mieses-Llavat ("Dr. Mieses"). Dr. Mieses noted that he had complaints of constant and sharp lower back pain that received some relief with pain medications. Tr. 410. He was on Relafen and Losartan and had a history of hypertension. *Id*. Dr. Mieses stated that he came alone and that he drove: she noted he had good muscular tone; was obese, alert, cooperative, and in no acute distress; answered all questions coherently; held on to the table to help himself stand; had no neck masses or adenopathy; and did not wheeze. Tr. 411. She claimed that he had symmetrical upper and lower extremities with functional range of motion and noted no marked atrophy or tenderness; she did see that he had a slow gait. *Id*. She found that he had tenderness and spasms in his lower back with decreased range of motion, lumbago secondary to degenerative joint disease and spasms, and mild bilateral carpal tunnel; however, she also noted that his straight leg raising and Spurling's tests were negative and that he had no marked spinal atrophy. *Id*.

In assessing Cruz's functional capacity, Dr. Mieses found that he could walk, stand and sit with minimal difficulties; could not walk on his toes or heels; could do "some repetitive movements of hands"; and could perform overhead and forward reaching using his upper extremities; could drive; could travel short distances; and had no speech difficulties. *Id*. She stated that he had 5/5 upper extremity motor strength proximally, 4+/5 upper extremity motor strength

distally, and 5/5 lower extremity motor strength. *Id*. Dr. Mieses found that Cruz could grip, grasp, pinch, finger tap, oppose his fingers, button a shirt, pick up a coin, and write with either hand, and also found that he had no tenderness, but that he did have positive Tinel and Phalen tests. Tr. 411, 415. She also noted that he should avoid heavy lifting, carrying, pushing and pulling secondary to his back problems. Tr. 411. In assessing Cruz's range of motion for all of his joints, Dr. Mieses found that he did not have full range of motion of his back, but that all of his other results were normal. Tr. 416-17. She stated that Cruz did not use a cane or require assistance for support. Tr. 414.

On November 23, 2015, Dr. Edelmiro Rodriguez ("Dr. Rodriguez") conducted a psychiatric evaluation on Cruz. Tr. 421. He noted that Cruz drove to the interview alone. *Id*. Cruz complained of insomnia, anxiety, preoccupation, crying spells, sadness, isolation, no desire to socialize, and variations in appetite. *Id*. Dr. Rodriguez noted that Cruz has an uncle who also received psychiatric treatment. *Id*. Dr. Rodriguez noted that Cruz sometimes had trouble bending to put his socks on due to his back; that he was well-developed but obese; that his dress and grooming were neat, clean, and casual; that his mood and affect were sad; that his thoughts were coherent, logical, and relevant; that he did not present with phobias, delusions, paranoia, ideation, or obsessions; that he was not suicidal or homicidal; and that he was in good contact with reality. Tr. 422. Dr. Rodriguez found that Cruz was well-oriented to person, place, and time, but that he had some memory issues, including memorizing words and remembering the months of the year. Tr. 422-23. He was also able to perform simple math and handle funds. Tr. 423. Dr. Rodriguez diagnosed Cruz with major depressive disorder, single episode. *Id*.

In late 2015, state agency consultants determined that Cruz was not disabled, that he had the RFC to perform light work, that he had hand function without limitations, and that he did not

have a significant depressive disorder. Tr. 200-07. Other state agency consultants reconsidered Cruz's case in March 2016 and came to the same findings. Tr. 213-20.

On November 16, 2015, the same day that Dr. Mieses's evaluation took place, Cruz underwent diagnostic imaging on his lumbosacral spine, AP and lateral views. Tr. 407. No fracture or dislocation was noted and normal alignment was maintained, though there was some anterior spurring of apposing end plates and severe straightening of the lumbar lordosis secondary to paravertebral muscle spasm. *Id*. The prevertebral and paravertebral soft tissues were noted to be unremarkable. *Id*.

Nearly two years later, a November 7, 2017 MRI of Cruz's thoracic spine revealed no herniated or bulging discs. Tr. 482. However, a MRI of Cruz's lumbar spine conducted on the same date revealed that there was a "large left paracentral disc protrusion producing significant impression upon the thecal sac and narrowing of left neural foramen." Tr. 483. A follow up note from Dr. Jose Perez dated November 16, 2017 noted that an MRI had revealed that Cruz had a large disc herniation. Tr. 444-45. The doctor noted that Cruz was a candidate for surgery as a result. Tr. 443. Cruz had cervical surgery performed on February 28, 2018. Tr. 54. Cruz also suffered a fall from a ladder towards the end of 2017, sometime after which the doctor that performed his cervical surgery suggested that he use something for support in case he ever lost his balance; Cruz apparently began to carry a cane as a result. Tr. 55-56, 442. He also stopped driving around this time. Tr. 57.

At the ALJ hearing, Cruz testified that before his onset date of December 31, 2016, he had experienced "intense lower back pain, and – I would feel a little bit of discomfort, but it wasn't to the point where – you know, until what happened, happened to me. . . . if I was going to sleep, I couldn't sleep on my side, I had to sleep face up. And if my hand was up, it would stay there, I

Cruz v. Commissioner of Social Security, Civil No. 19-1974 (BJM)                                    10

couldn't even lower it, practically, from the great pain." Tr. 64. He also testified that he took medication and pills, including injections, but that they did not help the pain much. Tr. 64-65.

The VE classified Cruz's former job as a crane operator as a heavy equipment operator (859.683-010), a position that the VE noted required "light work." Tr. 74. The ALJ first asked the VE the following hypothetical:

> "[L]et's assume we have a person who can lift and carry 20 lbs. occasionally and 10 lbs. frequently, the person can stand or walk approximately six hours in an eight-hour day and sit for approximately six hours in an eight-hour day. The person can push and pull the same strength as he can lift and carry. The person can frequently climb ramps and stairs, frequently climb ladders, ropes or scaffolds, balance frequently, stoop frequently, kneel frequently, crouch, crawl frequently, and the person can frequently do handling bilaterally. Can a person with these limitations perform the claimant's past work?"

The VE responded that such an individual could not perform the claimant's past work because "[t]o be an operator, it is necessary to use hands more than frequently." *Id*. The ALJ then asked if a person with the same vocational profile as the client could perform any jobs on a sustained basis that exist in the nation. Tr. 75. The VE answered yes: mail clerk, garment sorter, or electronic worker. *Id*. The ALJ then followed up by asking if a person meeting that description and with the limitations that they could perform simple, repetitive, routine tasks; understand, remember, and carry out jobs with simple instructions; and make decisions regarding simple tasks could do the same jobs. *Id*. The VE answered yes. *Id*. The ALJ then asked if the only reason that the hypothetical person from the first example could not perform the job was the person's inability to perform more than frequent handling, and the VE answered yes. *Id*. The VE also confirmed that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"). *Id*.

The ALJ found that Cruz last met the insured status requirements of the SSA on December 31, 2016. Tr. 32. She also found that he did not engage in substantial gainful activity during the period from his alleged onset date of August 3, 2012 through the date he was last insured. *Id*. The

ALJ noted that Cruz had the following severe impairments: degenerative disc disease of the lumbar spine, mild carpal tunnel syndrome, obesity, and major depressive disorder. *Id*. The ALJ considered whether Cruz's cervical disc disease was a severe impairment, but she noted that evidence of the condition postdated his date last insured by almost a year; he was initially diagnosed with cervical disc disease on November 16, 2017. *Id*.

The ALJ then went on to find that Cruz did not have an impairment or combination of impairments that met or medically equaled the severity of a listing. Tr. 33. In support of this finding, the ALJ noted that she considered Listing 1.04 – Disorders of the Spine; but that Cruz did not have degenerative discogenic disease resulting in compromise of a nerve root or spinal cord during the period at issue. *Id*. She also noted that he did not exhibit an inability to ambulate effectively on a sustained basis for any reason, including pain associated with underlying musculoskeletal impairment. *Id*. The ALJ also considered Listing 1.00 – Musculoskeletal System; however, she found that the record did not establish the involvement of one major peripheral joint in each upper extremity resulting in an inability for Cruz to perform fine and gross movements effectively. *Id*. The ALJ considered Listing 12.04 – Depressive, Bipolar and Related Disorders, Paragraphs B and C extensively, but found that Cruz did not meet the criteria established under either paragraph. Tr. 34-35. The ALJ also considered obesity in relation to Cruz's other symptoms but found that there was no evidence that his obesity was due to medical condition or that there was any indication it affected, "for instance, one of his weight-bearing joints." Tr. 33-34.

The ALJ then considered Cruz's RFC and found that Cruz had the RFC to perform light work, except that he could frequently climb ladders, scaffolds, stairs and ramps, balance, stoop, kneel, crouch, and crawl. Tr. 35. The ALJ also noted that he was able to perform frequent handling bilaterally; able to perform simple, routine and repetitive tasks; understand, remember, and carry

out simple instructions; and make decisions regarding simple matters. *Id*. In support of these findings, the ALJ stated that although Cruz's medically determinable impairments could reasonably be expected to cause his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical evidence and other evidence in the record. Tr. 36. The ALJ then acknowledged that Cruz suffered from a longstanding history of musculoskeletal conditions, citing certain x-ray and radiological findings while also noting that Cruz was treated conservatively with oral medication and physical therapy with good response. *Id*.

The ALJ also considered the evaluation conducted by Dr. Mieses and the treatment and opinion provided by Dr. Ramos. Tr. 36-37. She declined to give Dr. Ramos's opinion that Cruz was totally and permanently disabled any weight, noting that his opinion was inconsistent with his own treating notes for the period at issue and that his notes did not support a finding of disability. Tr. 36-37. She also noted that Dr. Ramos expressed no limitations in functioning for the time period at issue. Tr. 37. However, she gave great weight to Dr. Mieses's opinion because she found it was well-supported by medically acceptable diagnostic techniques, based on a comprehensive evaluation, and consistent with the substantial evidence of record. Tr. 36. The ALJ found that the state agency medical consultants' assessments agreeing that Cruz retained the RFC for light work with partial limitations were entitled to partial weight because manipulative restrictions were also warranted. Tr. 37 The ALJ also found that the state agency psychological consultants' assessments agreeing that Cruz's mental condition was not severe were entitled to little weight because they were inconsistent with evidence reasonably supporting the conclusion that Cruz's mental limitations were actually more severe. *Id*. The ALJ also considered but declined to address other

Cruz v. Commissioner of Social Security, Civil No. 19-1974 (BJM)                                                              13

evidence dated after Cruz's DLI, stating that the evidence did not add anything relevant to the period at issue. *Id*.

The ALJ then found that though Cruz was unable to perform his past relevant work, Tr. 38, that he could still perform jobs that existed in significant numbers in the national economy, including mail clerk, garment sorter, and electronics worker; the ALJ cited the VE's testimony in support of this claim. Tr. 38-39. As a result, the ALJ found that Cruz was not disabled. Tr. 39.

Cruz requested that the Appeals Council review the ALJ's decision, and on August 17, 2019, the Appeals Council denied his request for review. Tr. 1-9. Cruz then filed the present action on October 15, 2019. Dkt. 1.

**DISCUSSION**

Cruz challenges the ALJ's determination of his RFC, claiming that the ALJ erred by failing to have a physical medical advisor present at the ALJ hearing, that the ALJ did not properly address his use of a cane, and that the ALJ failed to properly address his symptoms of pain as purportedly established in the record. *See* Dkt. 24.

Cruz points to no requirement that a physical medical advisor be present at the hearing before the ALJ. Even if such a requirement did exist, I would be bound to uphold the ALJ's findings of fact if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). Regardless, Cruz's claim regarding the medical advisor is waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

Regarding Cruz's use of a cane, Cruz cites no evidence that he ever used a cane before his December 31, 2016 DLI, and there is some evidence that he did not actually do so. Cruz carried a

cane at the September 26, 2018 hearing before the ALJ; he testified that he only used the cane "sometimes" and that a doctor who had performed cervical surgery on him in February 2018 had "recommended" that he use something for support after the surgery "just in case." Tr. 54, 56. However, when filling out a function report for the SSA dated October 20, 2015, Cruz did not check a box on the form that asked if he used a cane. Tr. 118. Additionally, Dr. Mieses noted that Cruz did not use a cane or any other similar forms of assistance when she examined him on November 16, 2015. Tr. 414. Given that the only evidence of Cruz's use of the cane postdates his DLI, that Cruz's own statement by omission shows that he did not use a cane before the end of 2015 at the very earliest, and that Cruz's testimony at the ALJ hearing heavily implied that he did not use a cane before his DLI, Cruz's claims regarding the cane fail: in order to be eligible for disability benefits, a claimant must demonstrate that his disability existed prior to his DLI. *See, e.g.*, *Cruz Rivera*, 818 F.2d at 97.

Cruz also claims that the ALJ made improper medical conclusions regarding the pain he suffers when determining his RFC. Cruz notes that the evidence in the record for his pain includes the presence of herniated discs in his back and his need for pain medication, physiotherapy, and psychotherapy. Cruz provides citations to large portions of the record without actually developing the evidence or citing specific evidence as to the pain he has experienced; the only specific finding that he notes is Dr. Mieses's statement that Cruz could do "some" repetitive movements of hands; that he should avoid heavy lifting, carrying, pushing, and pulling; and that he can travel short distances.

Large sections of the record that Cruz provides citations to refer to medical information that postdates Cruz's DLI. For instance, the medical record reflects that Cruz was not diagnosed with bulging or herniated discs until November 2017. *See, e.g.*, Tr. 80-81, 434-45, 482-83. These

diagnoses occurred long after Cruz's December 31, 2016 DLI. *Cruz Rivera*, 818 F.2d at 97 ("Claimant is not entitled to disability benefits unless he can demonstrate that his disability existed prior to the expiration of his insured status"). Furthermore, there is evidence that Cruz did not have a herniated disc before his DLI. *See, e.g.*, Tr. 407 (November 16, 2015 imaging of Cruz's lumbosacral spine revealing "no fracture or dislocation" and the result including no mention of any herniated discs). It was therefore proper for the ALJ to not cite the evidence in the record regarding Cruz's herniated discs, as such evidence postdated Cruz's DLI.

Regardless, the ALJ clearly took the pain that Cruz experienced, particularly his back pain, into account when determining Cruz's RFC. In her RFC analysis, the ALJ noted that Cruz testified to experiencing acute low back pain, hand pain, anxiety, and panic attacks when he appeared at the hearing before her. Tr. 36. She stated that Dr. Mieses reported that Cruz's chief complaint was low back pain and that he had tenderness and spasm in his lower back and paraspinals with decreased range of motion, but that he had no marked atrophy and negative straight leg raising and Spurling's tests. *Id*. The ALJ also notes that Cruz took "oral medication and physical therapy with good response." Tr. 36. Despite possessing the burden of proof at this stage of analysis, Cruz does not craft any argument as to why this admittedly cursory reference to Cruz's use of medication and physiotherapy was inadequate. *See Zannino*, 895 F.2d at 17 ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). The ALJ goes on to address Cruz's psychotherapy in detail, but notwithstanding this, the record provides little or no support for the notion that Cruz's mental condition exacerbated his symptoms of pain regardless.

Furthermore, as noted above, the only specific evidence that Cruz cites in support of the claim that the ALJ made improper medical conclusions is Dr. Mieses's findings that Cruz could

do "some" repetitive movements of hands; that he should avoid heavy lifting, carrying, pushing, and pulling; and that he can travel short distances. However, none of Dr. Mieses's findings conflict with the ALJ's RFC determination, except arguably the ALJ's determination that Cruz can perform frequent handling bilaterally. Additionally, the ALJ addressed Dr. Mieses's findings regarding Cruz's hands in some detail, even giving Dr. Mieses's opinion "great weight" in her RFC determination. Tr. 36.

It is not clear what Dr. Mieses meant when she said that Cruz could do "some repetitive movements of hands." Tr. 411. Dr. Mieses does not actually state that Cruz has any limitations when it comes to performing repetitive movements with his hands, although from her statement it seems possible to infer that she does not believe that Cruz has full capacity to perform repetitive hand movements. The extent of any limitations implied by the word "some," however, is not obvious, and Cruz cites no other authority or evidence supporting the idea that he lacks full capacity to perform repetitive hand movements. The ALJ's finding is supported by other medical evidence in the record, and again, I am bound to uphold her finding if it is supported by substantial evidence. *See* 42 U.S.C.§ 405(g). Furthermore, it is unclear if the ALJ's RFC finding conflicts at all with Dr. Mieses's assessment of Cruz's hands. The ALJ found that Cruz was "able to perform frequent handling bilaterally," Tr. 35, which is arguably fully compatible with being able to perform "some repetitive movements of hands." Cruz does not explain how or why the ALJ's RFC finding might conflict with Dr. Mieses's assessment. *See Zannino*, 895 F.2d at 17 ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). As a result, I find that the issue Cruz raises as to Dr. Mieses's testimony is waived, as are the issues that Cruz raises as to the ALJ's analysis of the pain experienced by Cruz in determining his RFC.

Cruz v. Commissioner of Social Security, Civil No. 19-1974 (BJM)                                     17

Cruz argues that the first hypothetical question that the ALJ posed to the VE was unspecific and suggestive. Suggestiveness, however, is inherent to such questions and is not a negative quality, but rather a necessary one. It is unclear why asking an unspecific and suggestive hypothetical question could be harmful, and Cruz cites no authority in support of this supposed principle. Furthermore, the ALJ did not ask an "unspecific" hypothetical question. The first hypothetical question posed by the ALJ included many specifics, including that the hypothetical individual could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; could sit, stand, or walk for approximately six hours out of an eight-hour workday; could frequently climb ramps, stairs, ladders, ropes, and scaffolds; could balance,stoop, kneel, crouch, and crawl frequently; and could frequently perform handling bilaterally. Tr. 74.

Additionally, even assuming that the ALJ had posed the first hypothetical question in a way that could have somehow been harmful to Cruz's interests, the ALJ clearly did not cite or rely upon the answer to the first hypothetical question in forming her determination that Cruz could still perform jobs existing in significant numbers in the national economy. In fact, the VE's answer to the first hypothetical question posed by the ALJ was that the hypothetical individual could *not* perform Cruz's former job because the job requires more than frequent handling. The first hypothetical's answer therefore favored Cruz despite his argument that the hypothetical was detrimental to him. As a result, Cruz's claim regarding the first hypothetical question fails.

Cruz also claims that the VE's answer to the second hypothetical question posed by the ALJ provides a basis for finding that he is disabled due to the fact that he suffers pain. However, it is unclear what Cruz is alluding to. In response to the second and third hypothetical questions posed by the ALJ, the VE answered that the individuals discussed in the hypotheticals *could* in fact perform jobs on a sustained basis, saying nothing about any negative effects that pain might

have upon the hypothetical individuals. Cruz has failed to state a lucid claim and therefore the claim is waived. *See Zannino*, 895 F.2d at 17 ("issues adverted to in a perfunctory manner . . . are deemed waived").

Finally, Cruz implies that the ALJ erred in relying upon the VE's testimony because the VE consulted the DOT. The DOT is widely relied upon by VEs in social security cases and the Code of Federal Regulations explicitly states that the DOT is reliable. *See* 20 C.F.R. § 404.1566(d) ("When we determine that unskilled, sedentary, light, and medium jobs exist in the national economy . . . we will take administrative notice of reliable job information available from various governmental and other publications. For example, we will take notice of—(1) *Dictionary of Occupational Titles* . . ."). The VE in the present matter therefore acted properly by referencing the DOT and the ALJ properly relied upon the VE's testimony.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 12th day of October, 2021.

*S/Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge